The usual rules will apply, 15 minutes per side, save some time for rebuttal. We don't have a case after you, and if we unduly harass you with questions, we might not be able to get to you. The microphones are for recording, not amplification, so keep your voice up. Okay? Thank you. Thank you. Good morning, Your Honors. Before I begin, if I could have five minutes for rebuttal? Sure. Thank you. May it please the Court, Mr. Martinelli was injured in an accident with a driver who took his eyes completely off the road while navigating a lane change in a construction zone. In fact, that driver bent down so far that only the top of his forehead was visible. This morning, I will explain that the City did not proximately cause this accident because Oscar Soto's complete inattention to where he was driving was not foreseeable. And for this reason, the City is entitled to judgment notwithstanding the verdict. Alternatively, the City is entitled to JNOV because Section 3104 of the Tort Immunity Act immunizes the City from liability for failing to initially provide traffic control devices. And that's precisely what the jury's verdict attempts to do in this case. On other issues we have raised on appeal, unless the Court has any questions, we will rest on our briefs. First, I'd like to begin with the proximate cause issue. The City did not proximately cause this accident because Oscar Soto's utter inattention to where he was driving was not foreseeable as a matter of law. The jury didn't agree with that contention, did it? Your Honor, the jury was presented with four specific theories of liability. Now, I was speaking about the special interrogatory that trial counsel for the City submitted. They answered it in the negative. How do you get around that? Well, Your Honor, although proximate cause is generally a question of fact for the jury, in certain cases where the evidence is so one-sided, it is a question of law that can be decided on appeal. Well, Mr. Collins, isn't there always a degree of foreseeability of inattention, whether it's due to, in this case, to dropping a pack of cigarettes or another one to looking at a billboard or listening to or singing along with music on the radio? Isn't that part of what is expected, unfortunately, of most drivers at some point during the time of their operation of a motor vehicle? Your Honor, there are degrees of negligence. And in this case, the degree of negligence that Mr. Soto displayed was so egregious that it was unforeseeable as a matter of law. He reached for a pack of cigarettes that slipped off his lap. It's not like he was clipping his toenails. I mean, this strikes me anyway as sort of garden variety inattention. You could come up with 50 sort of simple ways of being inattentive in a car. This seems like it's one of the more simple and casual ones. Something slips from your lap. It wasn't an intentional act such as dialing a telephone or texting or, you know, any of the other things that people try to do when they multitask, unfortunately, while they operate motor vehicles. If this is on the side of unforeseeable behavior, almost everything that's inattentive might similarly be classified, wouldn't you say? Respectfully, Your Honor, no. I disagree. In this case, Mr. Soto's pack of cigarettes fell to the floor of his car, and he reached down to pick them up. And he physically reached down so far that only the top of his forehead was visible through his steering wheel. He was practically underneath the dashboard. And that's – Did he testify that it was instinct? I think I saw that word in the transcript, that instinctively his instinct was to do that. That was how Mr. Soto described it, Your Honor. But just because Mr. Soto acted thoughtlessly doesn't mean that it was instinctive in this case. No, I know. But, I mean, the arguments that you made at trial and the arguments that you make in front of us here as they relate to his conduct make it seem like this is the most unforgivable intentional conduct that a driver could ever engage in. And all we're talking about is seeing traffic come at him. He veers to the right, sees something, feels something, goes off his lap, and his instinct is to do something. That doesn't seem to be as horrific, intentional, and, you know, unforeseeable as what you might claim. Respectfully, Your Honor, I disagree. And the cases illustrate what type of negligence is negligent enough that it's unforeseeable. For example, in the Novander case, that was a pothole case. The court concluded that, as a matter of law, it was not foreseeable that a driver would seek to avoid a pothole by driving into the wrong lane of traffic. That negligence was unforeseeable. Similarly, in the Ziemba case, even though that was a duty case that the analysis focused on foreseeability there as well, the court concluded, as a matter of law, that it was not foreseeable that a driver backing out of a driveway would fail to check for oncoming traffic before backing out. Oscar Soto's negligence was even more egregious, and therefore more unforeseeable, than the drivers that were in Novander and Ziemba. He completely took his eyes off the road, practically blindfolding himself to his surroundings. And he testified, there was testimony that the SBC workers had set up safety cones around their vehicles, they had strobe lights on the top of their trucks. Mr. Soto never saw any of that when he approached before the accident happened. And that indicates that he was so utterly inattentive to where he was going. And that degree of negligence is not foreseeable as a matter of law. In the few cases where an intervening act of negligence is deemed foreseeable, typically there has been a direct link between the defendant's conduct and the third party's negligence. So, for example, in the Bentley case, that was a case involving a city that failed to clear foliage, that had obscured a traffic sign at an intersection. And a driver in that case negligently failed to recognize the presence of that intersection. So there was driver negligence. The court there said that that driver's negligence was foreseeable, because there was a direct link between the failure to recognize the intersection and the failure to warn of the presence of that intersection. Similarly, in the Lee case, the CTA negligently failed to warn of the presence of a third rail, and the decedent in that case negligently failed to realize that the third rail was there. So, again, there's a direct link between the third party's negligence and the defendant's conduct. Is it foreseeable to a motorist that the city would have a system set up with barricades and flag men and then they would go to lunch and take all that with them and leave the road situation otherwise like it was? How foreseeable is that? Well, Your Honor, in any case involving third party negligence, it could be said that if the defendant had done something differently, had set up additional measures, that an accident would not have happened. But when we're examining cause and fact, we're supposed to look at that, aren't we? Well, the foreseeability question in this case focuses on the foreseeability of the third party's negligent behavior. And that's Mr. Soto's negligence here. But isn't the reverse also true, that if you had perfect behavior by the injured in any of these cases, despite the negligence of the third party, that you wouldn't have had an accident? So where does that really get you? Well, Your Honor, to be clear, we're not demanding perfect behavior on the part of Oscar Soto. We're not saying that perfection was required of him. In this case, in fact, there's no evidence that a driver exercising just reasonable care would not have been able to return to his or her proper traffic lane. There is testimony that other cars used the wrong lane to avoid the partial obstruction on Milwaukee Avenue. And there's no evidence that anyone had any difficulty returning to their lane. Excuse me. Isn't part of the problem, though, that there was no guidance to the cars coming from the other direction either? So all of a sudden, Soto coming out from underneath the viaduct, out from dark to light, sees cars coming at him, and they weren't being directed away from cars that were being diverted into their lane by the trucks that were parked in the lane that Soto was avoiding. So from both directions, it was a problem. Well, Your Honor, the way you described the accident is how it happened. However, the conduct that needs to be focused on is the way that Oscar Soto reacted to this situation. And there are other cases where drivers have arguably been faced with confusing situations. For example, in the Quintana and in the Quirk cases, both of those involved inoperative traffic lights. And in those cases, the drivers saw that the traffic lights were not working, and they drove through the intersections anyway and caused an accident. But in this case, there was an expectation that, especially following the other car that had preceded Mr. Soto's, that this was the way you were supposed to react to being confronted with the partial or blockage of the southeast-bound lanes. And so when you highlight the fact that other people negotiated this without having a problem, we don't really know how many of them were confronted with an automobile coming directly at them in the same line as the record indicates occurred to Mr. Soto. That's true, Your Honor. But the key conduct here at issue that was not foreseeable was the way that Mr. Soto handled the situation that was in front of him. And when he was confronted with a car approaching him when he was in the wrong lane of travel, he responded by taking his eyes completely off the road to bend down to the floor of his car to pick up a pack of cigarettes. You know, there was a question by trial counsel for the city asked of the plaintiff, actually, when talking about the fact that the city's workers were supposed to be out for a half-hour lunch break. They phonied up some documents to make it look like they were only gone for a half-hour, but in fact they were gone a lot longer than that. And the question was, lunch rules are meant to be broken, aren't they, Mr. Martinelli? Do you remember that? Yes, Your Honor. Wouldn't the same be true for the rules of the road, that it's sort of they're meant to be broken? People go through red lights every day. People, you know, take their eyes off the road. Women apply makeup. People spill coffee on themselves. These things, rules of the road, are meant to be broken. That's why we have traffic court. Well, Your Honor, negligence does happen, unfortunately, quite a bit on the road. However, if the court says that this degree of negligence is okay, then texting while driving, putting on lipstick within the area is also. The negligence of the city seems a lot more egregious in this case than the negligence of the driver. I respectfully disagree because. You have safety set up. You've got barricades. You've got something physically blocking the access to the work area. You've got flag men out there. And then everybody takes a powder and goes to lunch. That sounds a lot more negligent than somebody being confronted with traffic coming at them very to the right and reaching for something that fell off his lap. Well, I just want to emphasize that Mr. Soda's reaction to his cigarettes falling to the floor of his car was different from a momentary glance that one makes when changing a radio station or to turn on windshield wipers. This was a sustained period of time when he was not looking at the road. And that is so far outside of what the city could have expected of a driver when confronted with this kind of situation. Was it your expert, Gary Cooper, that testified that there was all of three-and-a-half seconds that he had to react to this, to do what he did, all of this taking place within three-and-a-half seconds? Your Honor, there's some ambiguity as to the specific amount of time. But, yes, that's the ballpark of the amount of time that Mr. Soda would have had. In the context of a three-and-a-half second period of time where somebody testifies that his instinct, not that it was right, but his instinct was to look down. I just don't know how you can beat your chest about how horribly negligent and intentional this conduct was. It just doesn't ring true. Well, if I may set aside for the moment the proximate cause issue and move on to the Section 3104 issue. Okay. Can you address, I don't want to hijack your argument. Oh, sure. But could you address the issue that was raised in the appellee brief about the impact of the general verdict form on that? Sure, absolutely. The jury was presented with four different theories of liability. We don't know specifically which theory or theories the jury relied on in reaching its decision. Why don't we know? There was no special interrogatory on that issue, Your Honor. Clearly, and I'm not being smug, but the city's council knew how to submit one because they did on the issue of sole proximate cause. Respectfully, Your Honor, with respect to the Section 3104 issue, it's immaterial because each of the four issues that was presented to the jury, each of the four theories, implicates traffic control devices in some way. And so for that reason, the general verdict rule does not apply to our argument. And then much of the appellee brief on this topic was focused on the impact of the word initial in that statute. Would you like to address that? Sure. A couple points on that, Your Honor. We acknowledge that at one point the city had set up trucks as barricades and it had workers on the street directing traffic, and that those measures were not in place at the time of the accident. However, plaintiffs have consistently argued that whatever traffic control devices the city at one time did provide, they should have provided more, that whatever they provided was inadequate. So almost all of the plaintiffs' evidence regarding traffic control devices came through the testimony of their experts. I think they're saying that all the traffic safety shouldn't have gone out for lunch. Well, Your Honor, respectfully, I think that because of Mr. Cannon's testimony, and he's testifying about various measures the city should have taken that it never did, that included an advanced warning system, a transition area with channelization devices, a buffer zone, and a termination area, the city never set up those systems. And Mr. Cannon, I'm sorry. No, you go ahead. Mr. Cannon said that whatever the city did provide didn't come close to what he thought was necessary. Right. He talked about the permit that they pulled for it, talked about the manual on uniform traffic control devices and the city Department of Transportation, all of these different things, which clearly the city didn't even get nearly close enough to comply with those. But the stuff that the city had in place when its people were out there before they all went for a long lunch, that clearly could have had an impact on making things safer, couldn't it? Perhaps, Your Honor. But Section 3104 immunity still protects the city's decision to take away traffic control devices. So they can have it in the morning, take it away at lunch, and bring it back in the afternoon? If circumstances call. In this wild west during the lunch hour? Well, Your Honor, the Robinson case illustrates the principle, that just because a municipality puts up a traffic control device at one point does not mean that the city has to keep that device up forever. Understood. So a city's decision to take away a device is also immunized under Section 3104. But you're leaving the dangerous situation still there. At least some kind of a hole has been put in the pavement. A couple workers are out there and disputed testimony, but there was testimony that the ram hoe driver, our operator, got there before the accident happened and was already begun his work. And the barricades and the flagmen, you know, they're over at the pot bellies or wherever they said they went to lunch. Well, Your Honor, in this case, it appears that the excavation area was a two-inch depression. I think the evidence is pretty consistent on that point. Mr. Dwyer, who is the foreman of this case, testified that in his judgment, when his men were not in the street doing work, that the traffic control devices that were at one point provided were no longer necessary. Well, what about the manhole cover being open? Wasn't Mr. Martinelli still on the manhole? At that time, I don't believe so, Your Honor. I believe the SBC crew had mostly finished up its work at that point and the workers were just packing up their trucks. The city crew didn't know when that was going to happen. They had no way of knowing whether that manhole was going to be open or closed during the time that they were out at lunch, for their extended lunch. I suppose that's true, Your Honor. The SBC workers, though, did have their own traffic control devices set up around their car, around their vehicles. They had their traffic cones and they had strobe lights at the top of their vehicles. But it was a city's permit, is that correct? Yes. It wasn't SBC's permit. It was a city's permit. I believe there were separate – I think there were two permits in the case. Was there evidence of the SBC permit introduced at trial? Your Honor, I can't recall. I don't recall seeing that. Okay. The point, though, is that Mr. Dreyer believed, at the time he made his decision, that the safety measures that were in place at one point were not necessary. He was expecting another city worker, the Ramho driver. At some point, that was – His testimony was that the Ramho – I'm a little fuzzy about exactly what he thought, when he thought the Ramho driver was going to get there. But he certainly called for a Ramho driver and he knew that one was coming. He knew they were all going to lunch. He didn't know when the Ramho driver was going to get there. The Ramho driver is a city employee. Wouldn't logic tell you that some city damage prevention should be there when the Ramho driver is there, even excluding Mr. Martinelli? Well, Your Honor, it could very well be that, in retrospect, Mr. Dreyer, the foreman of the project, would have done things differently. He would have kept measures in place. Nonetheless, immunity still applies. Even when the wrong decision about traffic control devices is made, immunity still applies because we have – We have often fast-changing situations where workers are present at one time but not at another. And at different times, different traffic control measures are required. Okay, but don't the two policies, the City Department of Transportation and the MUTDC policies say, while this construction is going on, these are the measures that must be in place? So doesn't that impact on your whole immunity argument? You're saying that notwithstanding those two policies that come into play whenever you're cutting into a street, we can just decide willy-nilly we're not going to pay attention to traffic safety devices when we go to lunch, even though the policies say as long as there's construction going on. Now, they knew they were coming back. They knew the Ramho driver was going to be there. And at least some of the workers knew, whether Mr. Dreyer knew or not, that the SBC guy was still there. So I don't see how the two policies don't interfere with your immunity argument. Well, Your Honor, immunity under Section 3104 is absolute. And it applies even where regulations or statutes are not complied with. So even assuming that there was the noncompliance that you talked about, immunity still applies in this case. What did the permit require the city to do in terms of maintaining vehicular traffic while the work was going on? It was fairly open-ended, Your Honor. But it wasn't to close the road down. They were to keep traffic going, right? And it left discretion to the foreman of the project to use his best judgment to maintain vehicular and pedestrian traffic. And the foreman for the project was a man who testified several times that he didn't recall being at the job site there until after the accident happened, right? That was his recollection, yes. But he also testified that when his men were there before lunch, he instructed them to barricade and put the flagman out. Yes, Your Honor, you may have noticed in the transcript the verb tense that Mr. Dwyer used when describing what measures were in place. He often spoke in terms of – I don't think it was a grammar problem. I think it was an honesty problem. I believe he was just saying that I would have had this or I would have had these trucks in place. I would have had people on the street. I think he was referring to what his general practice was. And so whether he was there or not, by his recollection, that's what he would have done. Okay. Isn't it peculiar that in an accident in the work zone where a man has his leg totally severed, that the foreman couldn't remember whether he was there that morning or not? Meaning he would have had to have been informed at some point relatively quickly, a day, two days later, that a man's leg was severed? Your Honor, I can't explain Mr. Dwyer's recollection of that day. I'm sure you can. It was an unfair question. I apologize for it. That's okay, Your Honor. If the Court has no further questions at this time, I'd like to reserve. I'll just ask you one question. Sure. About the case that was cited in the Appley brief and how you would argue that we're not bound by the governmental inter-insurance exchange versus judge where they talk about the no-passing zone striping and the change afterwards. Why does that not doom your immunity argument? Because that case involved the erroneous placement of a single traffic control device, and that device was the center line of that road. This is not an erroneous placement case. This is a case where traffic control devices just were not provided at all. And so for that reason, Section 3104 immunity applies. Why isn't this an erroneous removal case? Your Honor, I have not encountered any erroneous removal cases in the law. And as I mentioned before, as you recall, the Robinson case respects a municipality's decision to take away a traffic control device. That decision is still immunized. Except under the policies that the permit required. Well, Section 3104 admits no exceptions to the permits. And that's why it was required them to keep those traffic control devices in place until they were finished with the job. As necessary, according to the judgment of the foreman. And so you would say as necessary includes removing them for lunch? That appeared to have been the foreman's judgment at the time based on his belief that his men were not going to be in the street. Thank you. Thank you. Thank you very much. Good morning, Your Honors. Michael Rasak. I'm here on behalf of the plaintiffs' appellees. Mr. and Mrs. Don Martinelli. With respect to whether or not Mr. Soto was the sole proximate cause which would have removed responsibility for the city, I simply want to emphasize a point. And I would like to start with counsel's own suggestion of what happened. Counsel said this was not a situation where somebody reached for a radio station. And I would agree with that. And that's the distinction here. If the court thinks that there's some doubt about whether or not Mr. Soto's conduct was foreseeable or not foreseeable, I would ask the court to keep in mind that it was not self-directed or intentional conduct. His conduct was rather an instinctive reaction to something. The best example I could think of, and it may sound silly, but I've heard of it happening, your child in the backseat screams and you turn around, or your dog jumps in your lap, things you don't anticipate, they're going to distract you. And in this situation, there is also, contrary to what counsel was suggesting, there was a link between that and the city's conduct, because it was the city's conduct in putting Mr. Soto there that led to the circumstances where any small distraction was going to cause a problem here. As the court recognizes, when Mr. Soto came out from underneath the viaduct, he thought he was going to keep, presumably thought he was going to keep driving and not have a problem. Instead, he happened to be the person who looked up, saw a car coming at him, jerked his wheel, and the rest of it, as he said, happened, I think his phrase was very quickly, split second. I believe he used the term split second. A far shorter period of time than the last two sentences I talked to this court. When you start to think about the time that it all occurred, it was truly a very split second situation. With respect to the question about 3-104 and whether or not the city can argue that it was immune here, our points were, I hopefully made clear in the brief, one is simply that under the general verdict rule or the two-issue rule, we had a situation where one of the charges to the jury was that they obstructed the roadway and they did that by digging a hole in the roadway and leaving it without doing what the permit said. The permit said if you dig a hole, you have to either level it or cover it with a steel plate when you leave. They left an obstructed roadway and that's what caused the accident. That has nothing to do with the other elements that 3-104 discusses and because the court cannot know whether the jury based its verdict on barricades or on leaving a hole and obstructing traffic in the street with your other equipment obstructing it as well, the general verdict rule requires that the court affirm. It's a difficult rule, I know, but it's the rule that's been followed. It's the rule that was followed in Dillon. The case is not that much different than the Dillon case. The court may recall in Dillon one of the charges that went to the jury had to do with negligent insertion of a catheter and the defendant said that charge never should have gone to the jury because the statute of limitations had run and in this case the defendant is saying the charges about anything to do with barricades should not have gone to the jury under the Tort Immunity Act and the court in Dillon said there were other charges there that the verdict could have relied upon, therefore we affirm and the same should be true here. With respect to the question of whether or not the statute can apply anyway, this was a work zone with flaggers and barricades, meaning the truck, when they started their construction that morning. It stayed that way all day. Mr. Dwyer agreed the work started at 8 something in the morning, did not end until 345. The backhoe was actually working there. I understand the city's argument to be well we have a right to take these things down when we go to lunch. Even if the court thought that was proper or that was a right, the evidence is that the work did not stop when they went to lunch. The backhoe operator apparently came later. Even though he testified contrarily. He said I wasn't and yet you have two witnesses who saw the backhoe, not only Mr. Santiago, but the city brought out from our expert Mr. Cannon that Mr. Soto originally said my way was blocked by a yellow backhoe. And it makes sense in a way because if you recall the backhoe operator said I'm not part of the job. These things are expensive. We have to move them around. So I sort of come and go during the day. So the work was going on and the road was still blocked. The testimony, the evidence was that one of the trucks was still blocking the roadway. I think it was Mr. Martinelli said it was a lane and a half out. So they've left an obstructed condition. And in the first line of their reply brief, the city said Mr. Soto was driving in a work zone. I would think that would pretty much close out the question of whether or not this was or was not a continuing project. And if it's a continuing project, then there isn't any issue about initially putting up the signs. They put up barricades. They put up the wrong kind, but they did put them there. Unless the court has some further questions, we would rest on our brief for any remaining argument that we have. Thank you. Just a few points, Your Honor. On this issue of instinct and whether Mr. Soto's reaching down for the cigarettes was an act of instinct and therefore more foreseeable. More foreseeable, yes. Sorry. Perhaps it would be instinctive to look at the cigarettes and maybe perhaps to want to go down and reach for them. But the actual act of physically bending down so far that his head is under the dashboard, that's no longer instinct, Your Honor. In the same way that perhaps when someone receives a text message while driving, it's instinct to want to respond right away. But the actual decision to punch out a message while you're driving, that's not instinct anymore. Have you ever had something in your hand and it slips and your instantaneous reaction is to reach for it and if you've had time to think about whether I should reach for it or not, it's already on the ground? Sure, Your Honor. I've of course had that instinct. In this case, though, the cigarettes had already fallen to the floor of the car. They were just sitting there and they were unlit cigarettes. There was no urgency to pick them up. And Mr. Soto still decided to bend down and pick them up at the exact moment when he was changing lanes in a construction zone. So that degree of negligence was not foreseeable as a matter of law. With respect to whether there was a direct link, a so-called direct link, between the city's conduct and Mr. Soto's negligence, we believe that there was no such direct link here. Again, comparing this case to the Lee case and the Bentley case, both of those cases involved a negligent failure to warn and the intervening negligence involved a failure to recognize that risk. There was no such direct link here. Once Oscar Soto decided to bend down and pick up his cigarettes, that was his decision and that was his negligence. Can you direct us to a case where the court approved doing what you want us to do on the special interrogatory and proximate cause? You submitted a special interrogatory to the jury. They answer it in the negative and the appellate court says, you know what, we're just going to undo all of that, even though proximate cause is usually a question of fact for the jury. Can you cite us with the case? Your Honor, I don't know of a case that played out specifically that way. Do you think the evidence in this case is strong enough for the city, based on the purposeful behavior of this driver and the careful work of the city, for us as a question of first impression to rule that way? I do think the evidence is clear enough, Your Honor. I respectfully don't think that this would be an issue or a question of first impression. This Court and the Supreme Court have often addressed cases involving driver negligence. I know, but there aren't that many cases where a defendant asks the jury, blames somebody else as the sole proximate cause, the jury says no, and then it comes up and the court says, you know, we're not going to go along with that. I think that would be remarkably unusual. I can't recall one ever happening. Well, of course. I think that would be legally unforeseeable. Well, Your Honor, whether the case is playing out the way this case is or whether it's a case that's decided on summary judgment, the Court is guided on the facts and the record. And that's all we have here in this case. With respect to Section 3104, the two-issue rule does not apply, even to the theory that counsel addressed. If the Court will indulge me, I'll just read the full instruction out loud. It's that the city, quote, blocked the southeast-bound traffic lanes on Milwaukee Avenue, forcing southeast-bound traffic to drive into the undivided northwest traffic lanes, unquote.  Because the only way that the city could have rendered the street undivided is through traffic control devices, barricades, barrels, things of that nature. And so for that reason, the general verdict rule does not apply because every single theory that was presented to the jury implicates traffic control devices. Unless the Court has any further questions, we ask that the Court reverse the judgment of the Circuit Court. Okay. Thank you very much. Thanks for the arguments and the briefs. All well done, and we will get back to you directly. Thank you. We're adjourned. Thank you to both sides for very well-presented arguments. Thank you.